IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

YRIG RISK RETENTION GROUP, INC., )
)
Plaintiff, )
)
v. ) CASE NO. 2:24-cv-729-ECM
) [WO]
TEXAS DEPARTMENT OF )
INSURANCE, *et al.*, )
)
Defendants. )

**MEMORANDUM OPINION and ORDER**

**I.  INTRODUCTION**

Plaintiff YRIG Risk Retention Group, Inc. ("YRIG"), a risk retention group

domiciled in Alabama, brought this declaratory judgment action pursuant to 28 U.S.C.

§§ 2201 and 2202 against the Texas Department of Insurance ("TDI") and Cassie Brown

("Commissioner") in her official capacity as Commissioner of the TDI (collectively,

"Defendants").[1]  YRIG seeks a declaration that it need not take action in response to a letter

from the TDI, contending that the TDI's demands in the letter amount to unlawful

regulation of YRIG's operation that is preempted by the Federal Liability Risk Retention

Act, 15 U.S.C. § 3901 *et seq.* ("LRRA").

---

[1] "Official capacity suits are suits against [the] agencies, not against the people through whom agencies act." *Hobbs v. Roberts*, 999 F.2d 1526, 1530 (11th Cir. 1993).  "[O]fficial capacity suits represent 'only another way of pleading an action against an entity of which an officer is an agent,' and a victory against a named individual in an official capacity suit is 'a victory against the entity that employs him.'" *Id.* (quoting *Kentucky v. Graham*, 473 U.S. 159, 167–68 (1985)).  Thus, the action against the Commissioner in her official capacity and the TDI is duplicative.  Consequently, the TDI is due to be dismissed as a Defendant.

Now pending before the Court are YRIG's motion for summary judgment (doc. 18) and the Commissioner's motion for judgment on the pleadings, or in the alternative, motion for summary judgment (doc. 33). The motions are fully briefed and ripe for review. Also before the Court is the amicus curiae brief of the National Risk Retention Association ("NRRA"). (Doc. 41-1). After careful consideration of the parties' briefs, evidentiary materials, and applicable law, and for the following reasons, the Court concludes that the Commissioner's motion (doc. 33) is due to be denied as moot to the extent it requests judgment on the pleadings and denied to the extent it seeks summary judgment, and that YRIG's motion for summary judgment (doc. 18) is due to be granted.

## II. JURISDICTION AND VENUE

The Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1332.[2] Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

---

[2] YRIG alleges that it is an Alabama citizen, that the TDI and the Commissioner are both Texas citizens, and that the amount in controversy exceeds $75,000.00 exclusive of interests and costs. (Doc. 1 at 3, para. 10). The Defendants argued, in a footnote, that the Court could not exercise diversity jurisdiction in this case because the TDI is not a citizen of any state for purposes of diversity jurisdiction. (*See* doc. 33 at 7 n.2). As explained *supra* note 1, the TDI is due to be dismissed from this action because the action against the TDI and the Commissioner in her official capacity is duplicative. Thus, the Court's dismissal of the TDI has cured any defect in YRIG's jurisdictional allegations. *See* 28 U.S.C. § 1653 ("Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts."); *Miller v. Stanmore*, 636 F.2d 986, 990 (5th Cir. 1981) (stating that § 1653 "should be liberally construed"); *see also Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981). The Court finds that YRIG and the Commissioner are citizens of different states, and that the amount in controversy requirement is satisfied. Therefore, the Court may exercise diversity jurisdiction.

## III.  LEGAL STANDARDS

### A.    Motion for Judgment on the Pleadings

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c).  "A motion for judgment on the pleadings is governed by the same standard as a motion to dismiss under Rule 12(b)(6)." *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1350 (11th Cir. 2018).  "Judgment on the pleadings is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts." *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998).  "All facts alleged in the complaint must be accepted as true and viewed in the light most favorable to the nonmoving party." *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1273 (11th Cir. 2008) (citing *Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001)).  "If a comparison of the averments in the competing pleadings reveals a material dispute of fact, judgment on the pleadings must be denied." *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014) (citation omitted).  But if "there are no material facts in dispute and the moving party is entitled to judgment as a matter of law," judgment on the pleadings should be granted. *Id.*

### B.    Motion for Summary Judgment

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting FED. R. CIV. P. 56(a)). "[A] court generally must 'view all evidence and make all reasonable inferences

in favor of the party opposing summary judgment.'" *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016) (citation omitted). However, "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018) (citation omitted). If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); FED. R. CIV. P. 56(c). The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id.* at 1311. The burden then shifts to the non-moving party "to establish, by going beyond the pleadings, that a genuine issue of material fact exists." *Id.* at 1311–12. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. Non-movants must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the

4

absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A) & (B).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the non-movant. *Fla. Int'l Univ. Bd. of Trs.*, 830 F.3d at 1252. Likewise, the reviewing court must draw all justifiable inferences from the evidence in the non-moving party's favor. *Id.* However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).

Cross-motions for summary judgment do not affect the applicable Rule 56 standard. *See, e.g., Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005); *Gerling Global Reins. Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1233–34 (11th Cir. 2001). "Cross-motions . . . will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed . . . ." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (per curiam) (citation omitted). "When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." *Muzzy Prods., Corp. v. Sullivan Indus., Inc.*, 194 F. Supp. 2d 1360, 1378 (N.D. Ga. 2002) (citation omitted).[3]

---

[3] Here, and elsewhere in this Opinion, the Court cites nonbinding authority. While the Court acknowledges these cases are nonprecedential, the Court finds them persuasive.

## IV.  BACKGROUND

### A.    Statutory Background

In 1981, Congress enacted the LRRA's predecessor, the Product Liability Risk Retention Act, Pub. L. No. 97-45, 95 Stat. 949 ("PLRRA"), in "response to the problems businesses had encountered in obtaining product liability coverage," which had become either prohibitively expensive or altogether unavailable. *Swanco Ins. Co.-Ariz. v. Hager*, 879 F.2d 353, 354 (8th Cir. 1989).  The PLRRA attempted to remedy this problem by, as relevant here, "allowing business to purchase insurance at more favorable rates . . . by forming self-insurance pools called risk retention groups." *Id.*   "Congress intended to reduce the cost and increase the availability of product liability insurance and to preempt certain state laws that prohibited or hindered the formation of these groups." *Id.*

In 1986, Congress amended the PLRRA via enactment of the LRRA, Pub. L. No. 99-563, 100 Stat. 3177.  The LRRA "expand[s] the scope of the preemption to enable risk retention . . . groups to provide not only product liability insurance but all types of liability insurance," and it also "include[s] provisions dealing with the permissible scope of state regulation of" risk retention groups, discussed further below. *Hager*, 879 F.2d at 354.

At issue in this case is the LRRA's preemptive scope.  As relevant here, the LRRA authorizes "persons or businesses with similar types of risk [to] form and own their own insurance company"—risk retention groups ("RRGs")—"to insure against their liability exposures." *State of Fla., Dep't of Ins. v. Nat'l Amusement Purchasing Grp., Inc.*, 905 F.2d 361, 363 (11th Cir. 1990) (citing 15 U.S.C. § 3901(a)(4)).  The LRRA defines an RRG, in pertinent part, as "any corporation or other limited liability association, . . . whose primary

activity consists of assuming, and spreading all, or any portion, of the liability exposure of its group members." 15 U.S.C. § 3901(a)(4).  And it defines "liability" as "legal liability for damages (including costs of defense, legal costs and fees, and other claims expenses) because of injuries to other persons, damage to their property, or other damage or loss to such other persons resulting from or arising out of[] . . . any business . . . , trade, product, services . . . ,  premises,  or  operations."  *Id.*  § 3901(a)(2)  (parenthetical  in  original). Moreover, RRGs may not provide insurance other than "liability insurance for assuming and spreading all or any portion of the similar or related liability exposure of its group members," and "reinsurance with respect to the similar or related liability exposure of any other risk retention group" as defined by the statute. *Id.* § 3901(a)(4)(G).

An RRG is "regulated primarily by the domiciliary state" in which it is charted, and "[t]he authority of non-domiciliary states to license and regulate risk retention groups is largely preempted." *Nat'l Amusement Purchasing Grp.*, 905 F.2d at 363; *see also* 15 U.S.C. § 3902(a).  "In sweeping preemption language," *Nat'l Amusement Purchasing Grp.*, 905 F.2d at 363, the LRRA provides that "a risk retention group is exempt from any State law, rule, regulation, or order to the extent that such law, rule, regulation, or order would . . . make unlawful, or regulate, directly or indirectly, the operation of a risk retention group except that the jurisdiction in which it is chartered may regulate the formation and operation of such a group," and further provides that non-domiciliary states have specifically enumerated powers. 15 U.S.C. § 3902(a)(1).  A non-domiciliary state may, for example, require RRGs to comply with the state's unfair claims and deceptive trade practices laws. *Id.* § 3902(a)(1)(A), (G).  Additionally, non-domiciliary states can

require that "a person acting, or offering to act, as an agent or broker for a risk retention group obtain a license from that State." *Id.* § 3902(c). Further, "nothing in [the LRRA] shall be construed to affect the authority of any State to make use of any of its powers to enforce the laws of such State with respect to which a risk retention group is not exempt under [the LRRA]." *Id.* § 3902(f).

Once the chartering state authorizes an RRG to operate as an RRG in that state, the RRG may operate nationwide free of most regulation by other states if the RRG "complies with the insurance laws of the state it chooses as its 'chartering jurisdiction.'" *Nat'l Warranty Ins. Co. RRG v. Greenfield*, 214 F.3d 1073, 1075 (9th Cir. 2000); *see also Wadsworth v. Allied Pros. Ins. Co.*, 748 F.3d 100, 108 (2d Cir. 2014) ("A major benefit extended to risk retention groups by the LRRA is the ability to operate on a nationwide basis according to the requirements of the law of a single state, without being compelled to tailor their policies to the specific requirements of every state in which they do business."). Thus, "with respect to risk retention groups, Congress carefully crafted a scheme which, on the one hand, provides for broad preemption of a non-domiciliary state's licensing and regulatory laws but which, on the other hand, explicitly preserves for those states several very important powers." *Nat'l Amusement Purchasing Grp.*, 905 F.2d at 363–64; *see also Wadsworth*, 748 F.3d at 104 ("In short, as compared to the near plenary authority it reserves to the chartering state, the [LRRA] sharply limits the secondary regulatory authority of non-domiciliary states over risk retention groups to specified, if significant, spheres."). Accordingly, the LRRA's preemption provisions "function[] not in aid of a comprehensive federal regulatory scheme, but rather to allow a risk retention group

8

to be regulated by the state in which it is chartered, and to preempt most ordinary forms of regulation by the other states in which it operates." *Wadsworth*, 748 F.3d at 103.

## B.    Factual Background[4]

YRIG is domiciled in the State of Alabama.  In June 2020, YRIG applied to the Alabama Department of Insurance ("ADI") seeking authorization to operate as an RRG and, in particular, to offer contractual liability insurance coverage—the Contractual Liability Insurance Policy ("CLIP")—to landlord members of Your Renters Insurance Group Association, LLC (the "Association"). (Doc. 18-5).  "The contractual liability insurance coverage" offered by YRIG would "cover certain contractual leasehold obligations the Association member landlords have with respect to their tenants." (Doc. 18-11 at 3).  On October 29, 2020, the ADI authorized YRIG to operate as an RRG. (Doc. 18-6 (Certificate of Authority)).  By authorizing YRIG to operate as an RRG, ADI determined that YRIG's CLIP falls within the LRRA.  On or about March 2, 2021, the TDI approved YRIG's application to operate as an RRG in Texas. (*See* doc. 18-8).

On December 2, 2021, the ADI approved YRIG's "[p]lan of operation revision." (Doc. 18-7 at 2).  The ADI's December 2, 2021 letter reads as follows:

> [ADI] has completed its review of [YRIG]'s July 15th, 2021 request for their plan of operation revision pursuant to ALA. Code § 27-31A-3(b) and ALA. ADMIN. Code 482-1-138-.16 [(regarding "Change[s] of Business")].  The documentation filed indicated a request for approval of changes in coverages, limits[,] and policy forms.  Based on the [ADI]'s actuarial review and YRIG's assigned analyst's review[,] I hereby approve this request for YRIG's business plan revision.

---

[4] The Court recounts the undisputed material facts.  The parties have represented to the Court on multiple occasions that there are no material facts in dispute. (*See, e.g.*, doc. 50 at 2; doc. 52 at 1–2).

(*Id.*).  Accordingly, the ADI determined that YRIG's policy offerings were consistent with its status as an Alabama RRG. (*See* doc. 18 at 5; doc. 41-1 at 20).

On October 2, 2024, the TDI sent YRIG a letter (the "TDI Letter") with "**NOTICE OF INTENT TO TAKE DISCIPLINARY ACTION**" in the subject line. (*See* doc. 18-9 at 2) (bold and capitalization in original).  The TDI Letter states that the TDI had determined that the CLIP "is not a liability insurance product within the meaning of [the LRRA]," and therefore "YRIG *cannot* offer this policy under its risk retention group authorization." (*Id.*) (emphasis added).  The TDI Letter further states that "YRIG *must* obtain a certificate of authority to operate as an insurance company in Texas in order to offer [the CLIP]," and if YRIG is "unwilling to alter its business practices to come into compliance, TDI may pursue administrative action to seek all available relief against YRIG." (*Id.* at 2–3) (emphasis added).

The TDI Letter further claims that the CLIP's Security Deposit Waiver is "confusing, deceptive, and misleading." (*Id.* at 8).  The Lease Addendum to the CLIP provides renters an option to either pay a traditional security deposit *or* to pay a small monthly fee instead—the "Security Deposit Waiver." (Doc. 33-2 at 14).  The attached "Explanation of Protections" indicates that selection of the monthly fee option means the landlord "waives the collection of the one-time Security Deposit during the Lease Term." (*Id.* at 15 (emphases omitted)).  The Lease Addendum also notes, however, that "[i]n the event the Property Management contract is terminated, the monthly fee . . . will cease and the [landlord] may require [the renter] to post a Security Deposit." (*Id.* at 14).  The TDI

10

Letter asserts that this waiver is deceptive and "misleading to renters," and therefore subject to regulation notwithstanding the LRRA:

> Th[e] Security Deposit Waiver is confusing, deceptive, and misleading to renters because it . . . states that if the lease terminates the landlord may still require [the] renter to post the security deposit, but the Explanation of Protection[s] contradicts it—stating that if the monthly fee is paid, the landlord waives collection of the one-time payment of the security deposit.

(*Id.*); *see* 15 U.S.C. § 3092(a)(1)(G) (permitting non-domiciliary states to require "compl[iance] with any State law regarding deceptive, false, or fraudulent acts or practices").

Additionally, the TDI Letter claims that YRIG is impermissibly allowing three entities—Your Renters Insurance; YRIG Administration; and Renter's Insurance Solutions, LLC—to "act or offer to act as" agents for YRIG without first obtaining a Texas license. (Doc. 18-9 at 11–14; *id.* at 14 ("YRIG is allowing three unlicensed entities . . . to act or offer to act as an agent for . . . placement of insurance on YRIG's behalf in Texas . . . without first obtaining a license as an agent.")).

Later in the letter, the TDI offers YRIG two options:  (1) comply with Texas law by, among other things, submitting an application to obtain a certificate of authority in order to become a Texas-licensed insurance provider; or (2) stop offering the CLIP and go into "run-off" in Texas, meaning YRIG could not write new business and must cancel existing policies. (*Id.* at 14–15).  The TDI Letter further states that if YRIG does not pursue one of these two options, the TDI "*will* pursue all available relief through disciplinary

11

action against YRIG, its principals, []its producing agents and persons that control those entities." (*Id.* at 14) (emphasis added).

## V.  DISCUSSION

In its motion for summary judgment, YRIG argues that the LRRA preempts the TDI's regulation of YRIG set forth in the TDI Letter, and YRIG further requests a declaratory judgment that it need not take any action in response to the TDI Letter.  The Commissioner moves for judgment on the pleadings, or in the alternative summary judgment, raising a number of arguments:  (1) YRIG lacks Article III standing; (2) YRIG's claim is not ripe; (3) LRRA preemption does not apply because the TDI may regulate YRIG's "non-LRRA activities" and also may require YRIG to comply with Texas law regarding deceptive practices and licensing; and (4) this Court should abstain from exercising jurisdiction in favor of Texas' administrative processes and courts.  The Court first addresses standing and ripeness.

### A.    Standing and Ripeness

"Standing and ripeness present the threshold jurisdictional question of whether a court may consider the merits of a dispute," and both derive from "the Constitution's Article III requirement that the jurisdiction of the federal courts be limited to actual cases and controversies." *Elend v. Basham*, 471 F.3d 1199, 1204–05 (11th Cir. 2006).  "The standing question . . . bears close affinity to questions of ripeness," i.e., "whether the harm asserted has matured sufficiently to warrant judicial intervention." *Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975).  But the doctrines are distinct:  traditionally, "standing deals

with which party can appropriately bring suit, while ripeness relates to the timing of the suit." *Elend*, 471 F.3d at 1205.

In determining whether YRIG has standing, the Court must assume that YRIG would succeed on the merits. *See Fed. Elec. Comm'n v. Cruz*, 596 U.S. 289, 298 (2022); *Warth*, 422 U.S. at 500; *Culverhouse v. Paulson & Co. Inc.*, 813 F.3d 991, 994 (11th Cir. 2016). So too with ripeness. *See Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1311 (D.C. Cir. 2010).

### 1. Standing

To have Article III standing, a plaintiff must establish three elements: "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). The Commissioner argues that both the injury and redressability elements are lacking.

The Commissioner contends that YRIG's claimed injury is "speculative" and that the TDI Letter does not set out any imminent or future action the TDI may take. For standing purposes, the claimed injury must be "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). And again, in evaluating standing, the Court assumes that YRIG would succeed on the merits. *See Cruz*, 596 U.S. at 298; *Culverhouse*, 813 F.3d at 994.

The Court finds that YRIG has sufficiently shown an actual or imminent injury. The TDI Letter gives YRIG two options: (1) take the steps necessary to become a licensed insurance company in Texas; or (2) stop offering the CLIP and go into "run-off" in Texas.

(Doc. 18-9 at 14–15). Option 1 would require YRIG to undertake the time and effort to comply with Texas law, which it claims contravenes the protections afford to it under the LRRA. Option 2 would result in YRIG losing hundreds of thousands of dollars in annual revenue from its business in Texas. If YRIG elects neither option, the TDI says it "*will* pursue all available relief through disciplinary action against YRIG," which YRIG again claims is preempted by the LRRA. (*Id.* at 14) (emphasis added). Assuming YRIG's success on the merits, YRIG has demonstrated an actual or imminent injury based on these facts.

The Court now turns to redressability, which requires the Court to determine "whether a decision in [the] plaintiff's favor would 'significant[ly] increase . . . the likelihood' that [the plaintiff] 'would obtain relief that directly redresses the injury' that [it] claims to have suffered." *Lewis v. Gov. of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (second and third alterations in original) (quoting *Harrell v. Fla. Bar*, 608 F.3d 1241, 1260 n.7 (11th Cir. 2010)). Assuming that YRIG wins on the merits, a favorable court decision would directly redress YRIG's claimed injury because YRIG would not be required to either undertake the time and effort to become a Texas-licensed insurance carrier or to go out of business in Texas, or else face disciplinary action by the TDI. The Commissioner argues that YRIG's injury is not redressable by a favorable court decision because the TDI can lawfully regulate activities which fall outside the LRRA's scope. The problem with this argument is that it assumes that the Commissioner is right on the merits and YRIG is

wrong. Consequently, the Court finds that YRIG has also demonstrated redressability, and YRIG has Article III standing to bring this action.[5]

### 2. Ripeness

The "ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993). "[R]ipeness is peculiarly a question of timing. [I]ts basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985) (internal citation omitted). "Two factors are pertinent to the analysis of ripeness: '(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration.'" *Little v. Strange*, 796 F. Supp. 2d 1314, 1334 (M.D. Ala. 2011) (quoting *Nat'l Adver. Co. v. City of Mia.*, 402 F.3d 1335, 1339 (11th Cir. 2005)). Both factors turn, at least in part, on whether the threatened injury is impending. *See id.* The fitness prong, however, also looks to whether the issue to be resolved is legal or factual. *Pittman v. Cole*, 267 F.3d 1269, 1278 (11th Cir. 2001) ("[C]laims are less likely to be considered 'fit' for adjudication when they venture beyond purely legal issues or when they require 'speculation about future events.'" (quoting *Cheffer v. Reno*, 55 F.3d 1517, 1524 (11th Cir. 1995))).

The Commissioner asserts that this case is not ripe because "the issues [YRIG] presents are not fit for judicial decision" and exercising judicial restraint would not work a

---

[5] The Court finds that YRIG has also satisfied the traceability requirement; the Commissioner does not argue otherwise.

hardship to either party—indeed, it contends that restraint "would afford [Texas'] administrative process the opportunity to resolve this matter." (Doc. 33 at 41–42). In sum, the Commissioner argues that "there is simply no assurance that the outcome of further negotiation necessarily leads to future injury" and that, "just as a roll of the dice can give way to any number of unknown outcomes, this case presents a myriad of unknown outcomes at this stage." (*Id.* at 41). YRIG argues that this "could not be more disingenuous," noting that the TDI Letter stated that, if YRIG failed to comply, "TDI will pursue all available relief through disciplinary action against YRIG, its principals, its producing agents[,] and persons that control these entities." (Doc. 38 at 26 (quoting doc. 18-9 at 14)).

YRIG has the better argument. The language used in the TDI Letter—which was captioned "**NOTICE OF INTENT TO TAKE DISCIPLINARY ACTION**" (doc. 18-9 at 2 (bold and capitalization in original))—leaves little doubt that, absent YRIG's compliance, disciplinary action is forthcoming. The letter states that "if YRIG desires to continue to offer [its] product to landlords and/or renters in Texas, it *must* come into compliance." (*Id.* at 14 (emphasis added); *see also id.* at 15 ("YRIG must provide an initial response to this notice within 14 days, indicating whether it either plans to apply to TDI for a certificate of authority or to submit a proposed plan for the run-off. Not later than 30 days from this notice, TDI expects the complete submission of either (1) the application and all filings, or (2) all elements of the proposed run-off plan.")). Thus, because the

16

threatened injury is impending and because this case presents a purely legal question, the Court finds that it is ripe for adjudication.[6]

## B.   The Commissioner's Motion for Judgment on the Pleadings

Having determined that YRIG has standing to pursue this action and that its claim for a declaratory judgment is ripe, the Court now turns to a procedural matter. As indicated above, the Commissioner moves for judgment on the pleadings or, in the alternative, summary judgment. (Doc. 33). The applicable standards for resolving either motion are substantially the same—whether any genuine disputes of material fact exist that would preclude entering judgment as a matter of law to the moving party. *See Perez*, 774 F.3d at 1335 ("If a comparison of the averments in the competing pleadings reveals a material dispute of fact, judgment on the pleadings must be denied."); *Hornsby-Culpepper*, 906 F.3d

---

[6] The Court acknowledges that a federal district court found that an RRG's lawsuit seeking to enjoin the TDI from prosecuting the RRG in a Texas administrative tribunal was not ripe. *See Empire Indem. Ins. Co. Risk Retention Grp., Inc. v. Brown*, 2024 WL 3173641 (W.D. Tex. June 25, 2024). In *Empire*, the TDI claimed that the plaintiff RRG was selling property insurance mischaracterized as liability insurance, and the TDI therefore "initiated an enforcement action against [the RRG] seeking a cease-and-desist order to prevent [the RRG] from doing business in Texas." *Id.* at *1. The enforcement action was referred to the Texas State Office of Administrative Hearings ("SOAH"), which set the matter for a final hearing on the merits. *Id.* The RRG then filed a federal lawsuit seeking "to enjoin TDI from prosecuting the case against [the RRG]." *Id.* The court determined that the RRG's "challenge to SOAH's administrative proceedings [wa]s not ripe because the [final] hearing ha[d] not yet taken place and no cease-and-desist order ha[d] been issued." *Id.* at *3. "Because the administrative proceeding [wa]s ongoing and the outcome remain[ed] uncertain," the court reasoned, "the challenge [wa]s unripe." *Id.* (footnote omitted).

The Court does not find *Empire* instructive in resolving the ripeness issue in this case. First, *Empire* did not address ripeness in the posture of this case: where an RRG received a letter from the TDI like the one YRIG received here. Thus, the Court would have to speculate about the *Empire* court's reasoning on ripeness if it were confronted with the circumstances of this case. Additionally, as to *Empire*'s conclusion that the action was not ripe even though the administrative process had commenced, that conclusion essentially operates, in this Court's view, as a decision to abstain in favor of the state administrative proceedings. For the reasons explained further below, the Court finds that abstention is not appropriate on this record. Finally, although not dispositive, the Commissioner did not cite or analyze *Empire*, and thus YRIG did not have an opportunity to address *Empire*'s applicability (or not) to this case. For these reasons, *Empire* does not change this Court's analysis or conclusion.

at 1311 ("Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" (quoting FED. R. CIV. P. 56(a))). The key distinction between a motion for judgment on the pleadings and a motion for summary judgment is what the Court may consider in resolving the motion. In resolving a motion for judgment on the pleadings, the Court must generally cabin its analysis to—naturally—the pleadings, but it may also consider materials that are central to the plaintiff's claims and undisputed under the incorporation by reference doctrine. *See Perez*, 774 F.3d at 1335, 1340 n.12; *see also Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024) (explaining the incorporation by reference doctrine). Motions for summary judgment, on the other hand, are resolved based on a more developed factual record, including "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A).

Here, the materials relied upon by the parties—including the ADI's documents regarding YRIG, the TDI Letter, and the CLIP—are all materials that likely could be considered under the incorporation by reference doctrine, and therefore the Commissioner's motion potentially could be resolved either as a motion for judgment on the pleadings or for summary judgment. However, because both parties have briefed motions for summary judgment, and given that the governing standards are virtually identical in this instance, the Court in its discretion will address the Commissioner's motion for summary judgment and will deny its motion for judgment on the pleadings as moot. *See Muzaffarr v. Ross Dress for Less, Inc.*, 2013 WL 3830122, at *1 (S.D. Fla. July 24,

18

2013) (denying motion for judgment on the pleadings filed along with a motion for summary judgment as "duplicative" in the interest of "efficien[cy]").[7]

## C.   The Parties' Cross-Motions for Summary Judgment

The TDI demands that YRIG either obtain the TDI's approval of the CLIP and become a licensed Texas insurance carrier, exit the Texas market, or face disciplinary action in a Texas administrative proceeding, based on the following determinations by the TDI:  (1) YRIG's CLIP is not "liability insurance" as defined in the LRRA; (2) certain agents or brokers have not complied with Texas licensing requirements; and (3) the Security Deposit Waiver provision in the CLIP is "confusing, deceptive, and misleading." To resolve the parties' cross-motions for summary judgment, the Court must determine whether the LRRA preempts this regulation of YRIG.

As to the first category, YRIG argues that Alabama determined that YRIG's CLIP is an insurance product under the LRRA, and therefore the LRRA prohibits Texas from second-guessing Alabama's decision with Texas' own judgment as to whether the CLIP is "liability insurance." The Commissioner counters that the LRRA does not preempt state laws that regulate an RRG's activities which are outside the scope of the LRRA and that YRIG's CLIP does not qualify as "liability insurance" under the LRRA; therefore, according to the Commissioner, because YRIG is offering insurance beyond what the LRRA allows, the TDI may regulate YRIG's "non-LRRA" activities (i.e., YRIG's provision of the CLIP).

---

[7] Even if the Court considered the Commissioner's motion for judgment on the pleadings, it is due to be denied for the same reasons the Commissioner's motion for summary judgment is due to be denied, which are discussed in further detail below.

The TDI believes that YRIG's CLIP is not "liability insurance" within the meaning of the LRRA.[8] However, it is undisputed that the ADI approved YRIG's CLIP as a proper insurance product under the LRRA. And only Alabama—the chartering state—has the authority to "regulate [YRIG's] formation and operation." *See* 15 U.S.C. § 3902(a)(1). Based on the undisputed facts, the Court finds that the TDI's demand that YRIG either become a licensed insurance carrier in Texas or exit the Texas market amounts to an impermissible regulation of YRIG's operation by a non-domiciliary state. *See id.*; *see also id.* ("Except as provided in this section, a[n RRG] is exempt from *any* State law, rule, or regulation, or order to the extent that such law, rule, regulation, or order would[] . . . make unlawful, or regulate, *directly or indirectly*, the operation of a[n RRG] . . . ." (emphases added)); *Preferred Physicians Mut. Risk Retention Grp. v. Pataki*, 85 F.3d 913, 915 (2d Cir. 1996) ("[T]he LRRA's preemption language is expansive. Both direct and indirect regulation of RRGs by non-domiciliary states are forbidden."). Moreover, the TDI's actions are not otherwise encompassed by one of the LRRA's enumerated bases for permissible regulation by a non-domiciliary state. *See* 15 U.S.C. § 3902(a)(1).

The Commissioner's reliance on § 3902(f) to justify the regulatory conduct is unconvincing. Section 3902(f) provides that "nothing in [the LRRA] shall be construed to affect the authority of any State to make use of any of its powers to enforce the laws of such State with respect to which a risk retention group is not exempt under [the LRRA]." The Commissioner argues that, in offering the CLIP, YRIG is not actually operating as an

---

[8] Neither party has requested that the Court independently determine whether the CLIP is "liability insurance" as defined by the LRRA. Assuming without deciding it would be proper for the Court to do so, the Court declines to make this determination on this record.

RRG because the CLIP does not comply with the LRRA. Thus, according to the Commissioner, § 3902(f) blesses the TDI's regulation because YRIG is "not exempt" under the LRRA with respect to YRIG's provision of the CLIP. But this reasoning assumes the Commissioner's conclusion—that the CLIP is not "liability insurance" under the LRRA—and it fails to adequately contend with the undisputed fact that the ADI approved YRIG's CLIP as a proper LRRA insurance product. Construing § 3902(f) as the Commissioner suggests would amount to an end-run around § 3902(a)(1)'s prohibition on non-domiciliary states regulating RRGs formation and operation. Therefore, the Court is not persuaded that § 3902(f) permits the TDI's regulation here.

The Commissioner's position is not only foreclosed by the LRRA's text; it is also plainly inconsistent with the LRRA's purpose. In enacting the LRRA, Congress chose a unitary model in which RRGs may "operate on a nationwide basis according to the requirements of the law of a single state, without being compelled to tailor their policies to the specific requirements of every state in which they do business." *Wadsworth*, 748 F.3d at 108. This model "cannot function if one state's approval [of an RRG] is binding only until another state disagrees" or if fifty-one jurisdictions can independently interpret what qualifies as "liability insurance." (Doc. 41-1 at 20).[9] In enacting the LRRA, Congress entrusted that judgment to the chartering state alone. While Texas may think it is unfair or unwise that Alabama's determination is binding on all other states, that is the regime Congress chose. Moreover, if the TDI is concerned about whether a particular policy

---

[9] While the Court recognizes that the NRRA's amicus brief is nonbinding, the Court finds it persuasive.

satisfies the LRRA's criteria, the TDI should direct those concerns to the domiciliary state, not to individual insurance carriers. For these reasons, the TDI's independent conclusion that the CLIP is not "liability insurance" does not provide a legal basis for the TDI to demand that YRIG either become a Texas-licensed provider or exit the Texas market.

The Court now turns to the Commissioner's argument that a discrete portion of the CLIP—the Security Deposit Waiver—is independently subject to the TDI's regulatory authority because it is "confusing, deceptive, and misleading to renters." (Doc. 18-9 at 8). The Commissioner submits that the Security Deposit Waiver therefore falls within the TDI's regulatory ambit. *See* 15 U.S.C. § 3902(a)(1)(G); TEX. INS. CODE § 541.001 ("The purpose of this chapter is to regulate trade practices in the business of insurance by[] (1) defining or providing for the determination of trade practices in [Texas] that are unfair methods of competition or unfair or deceptive acts or practices; and (2) prohibiting those trade practices.").

To the extent the Commissioner seeks to regulate YRIG due to the purported deficiencies of the Security Deposit Waiver, the Commissioner's argument is unavailing. Although the LRRA provides a narrow carveout for state "law[s] regarding deceptive, false, or fraudulent acts or practices," 15 U.S.C. § 3902(a)(1)(G), construing that provision as the Commissioner suggests—to permit a non-domiciliary state to regulate an RRG's operation based on one allegedly deceptive, false, or fraudulent policy provision—would provide an end-run around the LRRA's preemption scheme; the exception would swallow the rule. *See id.* § 3902(a)(1) ("Except as provided in this section, a[n RRG] is exempt from *any* State law, rule, or regulation, or order to the extent that such law, rule, regulation, or

22

order would[] . . . make unlawful, or regulate, *directly or indirectly*, the operation of a[n RRG] . . . ." (emphases added)).   The Court does not suggest that the TDI has no mechanism by which it could challenge YRIG's purportedly deceptive policy provision. *See Soyoola v. Oceanus Ins. Co.*, 986 F. Supp. 2d 695, 706 (S.D. W. Va. 2013) ("Dr. Soyoola's claim for false or deceptive practices arises under West Virginia's Unfair Trade Practices Act . . . . Because Dr. Soyoola's deceptive practices claim falls under an exemption to the LRRA [(§ 3902(a)(1)(G)], this claim is not preempted."). However, the Commissioner has not brought a deceptive practices claim in this case and has expressly requested that the Court *not* resolve the issue of whether YRIG's CLIP violates Texas law. (Doc. 33 at 35 ("Defendants do not seek a finding here or otherwise submit this ultimate question to the Court of whether YRIG's policies violate Texas law[] . . . .")).   Similarly, YRIG has not requested that the Court decide this issue. (*See* doc. 1 at 10 (requesting "a declaratory judgment that YRIG . . . is not obligated to respond or take any action in connection with the October 2, 2024 letter issued by the [TDI]")).   Accordingly, the Court finds that § 3902(a)(1)(G) does not provide a legal basis for the TDI to demand that YRIG either become a Texas-licensed provider or exit the Texas market.

The Court reaches a similar conclusion regarding the alleged licensing problems with certain YRIG agents. As indicated above, the TDI contends that three entities are acting or offering to act as YRIG's agents in Texas without obtaining a Texas license. The LRRA permits non-domiciliary states to "require that a person acting, or offering to act, as an agent or broker for a[n RRG] obtain a license from that State." 15 U.S.C. § 3902(c). Texas has taken advantage of this carveout. TEX. INS. CODE § 2201.004(a) ("A person,

23

firm, partnership, or corporation may not act or offer to act as an agent for, or aid in any manner in the solicitation, negotiation, or placement of insurance on behalf of, a[n RRG] or purchasing group operating in this state or a group member in this state without first obtaining a license as an agent . . . .").  Accordingly, the Commissioner argues that "YRIG is not in compliance with Texas licensing regulations and therefore[] Texas is permitted to regulate YRIG's licensing violations." (Doc. 33 at 32).  YRIG counters that those purported violations "would be violations of the broker or agent, not YRIG" and that, moreover, "[a]gent and broker licensing are not at issue in this case and bear[] no relevance to the declaratory judgment sought by YRIG." (Doc. 38 at 18; *accord* doc. 41-1 at 23 ("If YRIG were using unlicensed agents or entities to market its Policy in Texas, Texas would be within its rights to enforce its licensing laws against those individuals.  However, such enforcement must be directed at the agents—not at the RRG or its policy.")).

The Court agrees with YRIG.  Section 3902(c)'s plain language states that non-domiciliary states can require that "*a person* acting, or offering to act, as an agent or broker *for a risk retention group* obtain a license from that State." 15 U.S.C. § 3902(c) (emphases added).  Thus, this section applies to YRIG's agents or brokers, not YRIG itself. Additionally, for the same reasons explained above regarding deceptive practices, any licensing problems would not provide a legally sufficient basis for the TDI to regulate YRIG as stated in the TDI Letter. *See also* 15 U.S.C. § 3902(a)(1) (exempting RRGS from non-domiciliary states' laws, rules, regulations, or orders that would "make unlawful, or regulate, *directly or indirectly*, the operation of a[n RRG]." (emphasis added)).

24

For these reasons, the Court concludes that the TDI Letter's demand for YRIG to either become a licensed insurance carrier in Texas or exit the Texas market constitutes an impermissible regulation of YRIG's operation by a non-domiciliary state and is therefore preempted by the LRRA.

## D.    Abstention

The Commissioner further argues that the Court should abstain from exercising jurisdiction in this case under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), or *Younger v. Harris*, 401 U.S. 37 (1971).  The Court addresses each argument in turn.

### 1.  *Burford* Abstention

"*Burford* is 'an extraordinary and narrow exception' to a federal court's 'virtually unflagging obligation' to exercise jurisdiction." *Deal v. Tugalo Gas Co., Inc.*, 991 F.3d 1313, 1327 (11th Cir. 2021) (citations omitted).  "A central purpose furthered by *Burford* abstention is to protect complex state administrative processes from undue federal interference." *Siegel v. LePore*, 234 F.3d 1163, 1173 (11th Cir. 2000) (en banc) (per curiam).  However, *Burford* "does not require abstention whenever there exists such a process, or even in all cases where there is a 'potential for conflict' with state regulatory law or policy." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 362 (1989) (citation omitted) (hereinafter "*NOPSI*").  As the Supreme Court stated in *NOPSI*:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance

25

transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*Id.* at 360–61. And *Burford* abstention "is rarely, if ever, appropriate when federal law preempts state law." *Boyes v. Shell Oil Prods. Co.*, 199 F.3d 1260, 1266 (11th Cir. 2000); *see also Baggett v. Dep't of Pro. Regul., Bd. of Pilot Comm'rs*, 717 F.2d 521, 524 (11th Cir. 1983) ("When, because of preemption, a particular state proceeding is beyond its regulatory authority, the need for protection of the state's comprehensive regulatory scheme, to the extent that it is legitimate, lends no support for abstention . . . .").

The Commissioner has not shown that *Burford* abstention is appropriate in this case. First, the Commissioner has not established that there is an ongoing proceeding or order of a state administrative agency with which this Court would be interfering. The Commissioner represents to the Court that the TDI *could* bring a contested case under the Texas Insurance Code, which would then trigger an administrative hearing. But the Commissioner does not state that the TDI has brought such a case or that an administrative hearing has commenced. For this reason alone, *Burford* abstention is not appropriate. *See Deal*, 991 F.3d at 1326–27 (reversing the district court's decision to abstain under *Burford* because there was no ongoing state administrative proceeding). Additionally, the Commissioner fails to demonstrate that this case otherwise satisfies the criteria for *Burford* abstention, which is "'an extraordinary and narrow exception' to a federal court's 'virtually unflagging obligation' to exercise jurisdiction." *See id.* at 1327. The applicability of LRRA preemption further underscores the Court's conclusion. *See Boyes*, 199 F.3d at 1266. For

26

these reasons, the Court declines to apply *Burford* abstention.

### 2. *Younger* Abstention

The Court now turns to *Younger* abstention.  In *Younger*, the Supreme Court "held that absent extraordinary circumstances federal courts should not enjoin pending state criminal prosecutions." *NOPSI*, 491 U.S. at 364.  This holding was based on principles of comity and equity. *Id.*  The Supreme Court has also applied *Younger* to "civil enforcement proceedings" and "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Id.* at 368.  If the case falls into one of those three categories, the court must determine whether to abstain by considering the "*Middlesex* factors": "*first*, do [the proceedings] constitute an ongoing state . . . proceeding; *second*, do the proceedings implicate important state interests; and *third*, is there an adequate opportunity in the state proceedings to raise constitutional challenges." *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982).  Importantly, the satisfaction of the *Middlesex* factors alone is not sufficient to justify *Younger* abstention. *See Sprint Commc'ns v. Jacobs*, 571 U.S. 69, 81 (2013) (explaining that the *Middlesex* factors are "not dispositive").  Rather, courts consider the *Middlesex* factors only after determining that the case falls into one of the categories identified by the Court in *NOPSI*. *See id.*

The Commissioner argues that the Court should abstain under *Younger* because, according to the Commissioner, all three *Middlesex* factors favor abstention.  In support, the Commissioner cites this Court's decision in *Leonard v. Alabama State Board of Pharmacy*, in which the Court abstained under *Younger*. *See* 591 F. Supp. 3d 1155, 1170–

27

73 (M.D. Ala. 2022), *aff'd*, 61 F.4th 902 (11th Cir. 2023).  But the Commissioner does not argue, let alone establish, how this case falls into one of the three categories to which the Supreme Court has applied *Younger*.  The administrative hearing contemplated by Texas statute is plainly not a "criminal prosecution."  And it does not involve an order that is uniquely in furtherance of the state courts' ability to perform their judicial functions, such as a civil contempt order. *See Juidice v. Vail*, 430 U.S. 327, 336 & n.12 (1977).  Thus, *Younger* abstention may be appropriate only if the Texas administrative hearing is a "civil enforcement proceeding" that is "'akin to a criminal prosecution' in 'important respects.'" *Sprint Commc'ns*, 571 U.S. at 79 (quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975)).  "Such enforcement actions are characteristically initiated to sanction the federal plaintiff, *i.e.*, the party challenging the state action, for some wrongful act," and "a state actor is routinely a party to the state proceeding and often initiates the action." *Id.* Moreover, "[i]nvestigations are commonly involved, often culminating in the filing of a formal complaint or charges." *Id.* at 79–80.  And again, the Court applies the *Middlesex* factors only after determining that the case falls into one of the three categories identified by the Supreme Court. *See Jacobs*, 571 U.S. at 81.

On this record, the Commissioner has not shown that the administrative hearing is a "civil enforcement proceeding" for purposes of *Younger* abstention.  This case is therefore distinguishable from *Leonard*, because the Court found that *Leonard* involved a "civil enforcement proceeding" *and* that the *Middlesex* factors counseled in favor of

28

abstention. *See Leonard*, 591 F. Supp. 3d at 1170–73.[10]  For these reasons, the Court finds that *Younger* abstention is not warranted here.

## VI.  CONCLUSION

As explained above, the Court concludes that YRIG has Article III standing, YRIG's claim is ripe, and the TDI's demand for YRIG to either become a licensed insurance carrier in Texas or exit the Texas market constitutes an impermissible regulation of YRIG's operation by a non-domiciliary state and is therefore preempted by the LRRA. Additionally, the Court concludes that neither *Burford* abstention nor *Younger* abstention is appropriate.  Consequently, the Court concludes that the Commissioner's motion for summary judgment is due to be denied, YRIG's motion for summary judgment is due to be granted, and YRIG is entitled to a declaration that it need not take action in response to the TDI Letter.

Accordingly, it is

ORDERED as follows:

1.        The TDI is DISMISSED as a Defendant;

---

[10] And regarding the *Middlesex* factors, as explained above, there is no indication that the state proceeding is ongoing here.  Consequently, even if this case involved a "civil enforcement proceeding," this *Middlesex* factor would weigh against abstention.

Additionally, even if the *Younger* abstention factors are satisfied, this Court may nonetheless exercise jurisdiction over the action if it is "facially conclusive" that federal law preempts the state enforcement action. *See Leonard*, 61 F.4th at 913.  To be sure, this exception to abstention is narrow and applies only in the "'clearest' cases of preemption." *Id.* (quoting *Hughes v. Att'y Gen. of Fla.*, 377 F.3d 1258 (11th Cir. 2004)).  Although the Court need not decide this issue, the Court observes that, for the reasons explained above, YRIG has presented a very strong case of preemption.  The Court merely underscores that this exception could provide another obstacle to the applicability of *Younger* abstention here.

2.    The Commissioner's motion (doc. 33) is DENIED AS MOOT to the extent it seeks judgment on the pleadings and DENIED to the extent it seeks summary judgment;

3.    YRIG's motion for summary judgment (doc. 18) is GRANTED;

4.    YRIG is not required to take action in response to the TDI's October 2, 2024 letter;

5.    All pending motions are DENIED as moot, and all pending hearings and deadlines are TERMINATED.

A separate Final Judgment will be entered.

DONE this 19th day of March, 2026.

_____/s/ Emily C. Marks_____
EMILY C. MARKS
UNITED STATES DISTRICT JUDGE